**Allen F. GILBAR, Plaintiff,**

v.

**UNITED STATES of America, Defendant.**

**No. C–3–98–11.**

United States District Court, S.D. Ohio, Western Division.

March 19, 1999.

James W. Kelleher, Pickrel Schaeffer & Ebeling, Dayton, OH, Richard T. Brown, Fairborn, OH, for Plaintiff.

**DECISION AND ENTRY SUSTAINING DEFENDANT'S MOTION TO DISMISS, PURSUANT TO FED. R. CIV. P. 12(b)(1) (DOC. # 16); JUDGMENT TO ENTER IN FAVOR OF THE DEFENDANT AND AGAINST THE PLAINTIFF, DISMISSING THE CAPTIONED CAUSE WITH PREJUDICE; TERMINATION ENTRY**

RICE, Chief Judge.

This litigation involves the publication of allegedly false and defamatory statements, to members of his unit regarding another officer, by an inactive status member of the United States Air Force Reserves. Pending before the Court is the Motion of Defendant United States to Dismiss, pursuant to Fed.R.Civ.P. 12(b)(1) and 12(b)(6). (Doc. # 16) For the reasons assigned, Defendant's Motion (Doc. # 16) is Sustained, pursuant to Fed.R.Civ.P. 12(b)(1), and the captioned cause is ordered dismissed for lack of this Court's subject matter jurisdiction.[1]

---

1. This Court has not considered and sustained the Defendant's Motion under its alternate theory, to wit: that the Plaintiff's Complaint fails to state a claim on which relief can be granted, pursuant to Fed.R.Civ.P. 12(b)(6). Therefore, any materials outside the pleadings

## I. *Background*

The parties agree to the following facts. Plaintiff Allen Gilbar ("Gilbar"), at the time of the events underlying this lawsuit, was a major in the United States Air Force, assigned to the 445th Aeromedical Evacuation Squadron stationed at Wright–Patterson Air Force Base. Former Defendant Gregory Mathews ("Mathews") was an administrative officer in Air Force Reserves, with the rank of major, who was assigned to the same unit as Gilbar. On April 4, 1997, Mathews submitted a request for a transfer to another unit. On that date, he was reassigned to inactive status.

Beginning on December 20, 1996, Mathews drafted a 16–page document, which he later submitted as a grievance within the Air Force. According to Gilbar, this document contained Mathews' opinions regarding Plaintiff's psychological health. In particular, the document stated that Mathews believed Gilbar demonstrated abnormal behavior, indicating a psychological disorder. Although Mathews has doctorate in psychology, he has not, at any time, possessed a duty status or professional position with the Air Force as a psychologist.

During January and February of 1997, Mathews presented the document to the Active Duty Inspector General and to JAG officers at Wright Patterson Air Force Base. On April 4, 1997, Mathews distributed copies of the document to select members of his unit, including both officers and enlisted personnel, while at Wright Patterson Air Force Base. Mathews also hand-delivered a copy of the document to one officer at his home near Columbus, Ohio.

On December 8, 1997, Gilbar initiated this litigation in the Greene County Court of Common Pleas, alleging that Mathews negligently, recklessly, and intentionally published false and defamatory statements about Gilbar; negligently or intentionally disparaged him; and tortiously interfered with his business relationship. (Doc. # 1) Mathews filed an Answer in the state court on January 7, 1998, denying each allegation. (*Id.*) On January 9, 1998, Mathews filed a Notice of Removal (Doc. # 1), removing this action from the Court of Common Pleas to this Court, pursuant to 28 U.S.C. §§ 1441(a) and (b) and 1442a. He asserted that this Court has subject matter jurisdiction over Gilbar's claims pursuant to 28 U.S.C. § 1331, which provides for subject matter jurisdiction over civil actions arising under federal law.

On February 6, 1998, Gilbar filed a Motion for Remand. (Doc. # 7) In his Motion, Gilbar claimed that removal under §§ 1441 and 1442a was inappropriate, because Mathews was not an officer of the United States at the time of the actions in dispute and did not "act under color of office or status." (*Id.*) As an alternative to immediate remand, Plaintiff requested an early evidentiary hearing for a determination of these issues. (*Id.*) On June 11, 1998, Defendant filed a Notice of Substitution by the United States, pursuant to 28 U.S.C. § 2679 ("Westfall Act"), substituting the United States for Mathews as a Defendant, and a Certification by the United States Attorney that Mathews was acting within the scope of employment at the time of the events alleged in Gilbar's Complaint. (Doc. # 14) Because certification is dispositive on the issue of removal, the Court denied Gilbar's motion for remand. However, because Gilbar challenged the conclusion that Mathews had acted within the scope of his employment and, thus, the propriety of the substitution of the United States, this Court ordered the parties to submit evidence on that issue.

Arguing that the United States is immune from suit for libel and slander, the United States has filed a motion to dismiss the instant lawsuit. (Doc. # 16) In order to resolve the motion of the United States, the Court must determine whether the substitution of the United States as Defendant was proper. Accordingly, the Court

considered by the Court do not convert this Motion into one for summary judgment.

must now address whether Mathews acted within the scope of his employment when he distributed his 16–page document to members of his unit.[2] As discussed below, the Court concludes that Mathews acted within the scope of his employment and the motion of the United States is sustained.

 The central issue before the Court is whether Mathews acted within the scope of his federal employment when he engaged in the acts forming the factual basis for Gilbar's Complaint. If so, the United States properly substituted itself as the Defendant. 28 U.S.C. § 2679(d)(2). As stated previously (Doc. # 18), this issue is not mooted by the fact that the United States Attorney has certified that Mathews was so acting or by the issuance of this Court's Order Substituting the United States of America as Federal Defendant Changing Case Caption (Doc. # 17). Although the U.S. Attorney's Certification is conclusive for purposes of removal, it does not conclusively establish as correct the substitution of the United States as defendant in place of the individual federal employee. *Gutierrez de Martinez v. Lamagno*, 515 U.S. 417, 434, 115 S.Ct. 2227, 132 L.Ed.2d 375 (1995). A plaintiff may still challenge the propriety of the certification and the substitution of the United States for the named defendant. *Id.* If the plaintiff's challenge is successful, the individual federal defendant would be resubstituted as the defendant, and the suit would proceed against him in his individual capacity in federal court, subject to a review of the court's subject matter jurisdiction. *See id.* at 434–36, 115 S.Ct. 2227. The Certification itself serves as *prima facie* evidence that Mathews' conduct was within the

scope of his employment for the purposes of substituting the United States as defendant. *E.g., RMI Titanium Co. v. Westinghouse Elec. Corp.,* 78 F.3d 1125, 1143 (6th Cir.1996).

 When challenging a certification decision, a plaintiff must present evidence from which a District Court reasonably could find that the original defendant-employee acted *outside* the scope of his employment. As noted above, certification serves as *prima facie* evidence that an employee acted *within* the scope of his employment. Therefore, if the United States substitutes itself as the defendant and moves to dismiss, a plaintiff cannot defeat the motion merely by relying upon the factual allegations in his complaint. *Rutkofske v. Norman,* 114 F.3d 1188, 1997 WL 299382 (6th Cir. June 4, 1997). A plaintiff may defeat a motion to dismiss, however, by providing the District Court with evidence that raises a genuine issue of material fact on the scope-of-employment issue. *Id.* at *4. When a plaintiff produces admissible evidence controverting the government's certification decision, a District Court must conduct an evidentiary hearing in order to determine whether the United States properly substituted itself as the defendant and removed the plaintiff's lawsuit from state court. *Id.* (reasoning that an evidentiary hearing on the scope-of-employment issue is necessary only when the record contains conflicting evidence with respect to a material fact); *see also Heuton v. Anderson,* 75 F.3d 357, 361 (8th Cir.1996) (holding that when the scope-of-employment issue is disputed, district courts must conduct an evidentiary hearing).[3] For purposes of certi-

---

**2.** Plaintiff does not object to the distribution of the document to the Active Duty IG and to JAG personnel, because they were within official channels for the miliary grievance process. (Doc. # 26, p. 3) Plaintiff's lawsuit focuses on the "publication and dissemination of this document to other enlisted and officer personnel of lesser or equal rank to him in the chain of command, and personnel who were outside of the official military grievance pro-

cess *after his [Matthews']supervisors, the JAG and IG told him to drop the complaint."* (Doc. # 26, p. 3–4)(emphasis in original)

**3.** Of course, no evidentiary hearing on the certification issue is necessary "where even if the plaintiff's assertions were true, the complaint allegations establish that the employee was acting within the scope of his/her employment." *RMI Titanium Co. v. Westing-*

fication and substitution, the issue of whether a federal employee acted within the scope of her employment is governed by state law. *Woods v. McGuire,* 954 F.2d 388, 390 (6th Cir.1992). In the present case, the conduct at issue occurred at Wright Patterson Air Force Base in Dayton, Ohio. Consequently, the Court looks to Ohio law to determine whether Mathews acted within the scope of his employment when he performed the acts giving rise to Gilbar's Complaint.

■ Under Ohio law, an employee acts within the scope of her employment if her conduct: (1) is of the kind which she is employed to perform; (2) occurs substantially within the authorized limits of time and space; and (3) is actuated, at least in part, by a purpose to serve the employer. *Anderson v. Toeppe,* 116 Ohio App.3d 429, 436, 688 N.E.2d 538, 543 (6th Dist.1996); *see also RMI Titanium Co. v. Westinghouse Elec. Corp.,* 78 F.3d 1125, 1143 (6th Cir.1996) ("Under Ohio law, an employee acts within the scope of his employment if the employee acts within his authority during the course of employment even though acting intentionally or maliciously."). On the other hand, an "intentional and willful attack committed by an agent or employee, to vent his own spleen or malevolence against the injured person, is a clear departure from employment and his principal or employer is not responsible therefore." *Byrd v. Faber,* 57 Ohio St.3d 56, 59, 565 N.E.2d 584, 587 (1991); *Henson v. NASA,* 14 F.3d 1143, 1147 (6th Cir.1994). "An employer is not liable for the independent acts of employees that in no way facilitate or promote the employer's business." *Anderson,* 688 N.E.2d at 543. Further-

more, for an employer to be liable for the acts of the employee, when that employee engages in intentional tortious conduct, the employee's behavior "must be calculated to facilitate or promote the business for which he was employed or engaged." *Cooper v. Grace Baptist Church,* 81 Ohio App.3d 728, 737, 612 N.E.2d 357 362 (10th Dist.1992).

■ An employee's defamatory comments at work about another employee may fall outside the scope of employment, thereby not subjecting the employer to liability under *respondeat superior* principles. *E.g., Trader v. People Working Cooperatively, Inc.,* 104 Ohio App.3d 690, 663 N.E.2d 335 (1st Dist.1994).[4] For example, in *Lamson v. Firestone Tire and Rubber Co.,* No. 14692, 1991 WL 35098 (9th Dist. March 13, 1991), the plaintiff filed suit against his former employer for defamation, after being terminated for sexually harassing a co-worker. The plaintiff sought to hold Firestone liable for allegedly defamatory comments that the female co-worker had made to fellow employees about his sexual harassment. Finding the victim's remarks outside the scope of her employment, the *Lamson* court reasoned:

Perry's theory of recovery fails in two respects. First, under respondeat superior, the test of Firestone's liability for Chandler's allegedly defamatory statements is not simply whether Chandler was in Firestone's employ, but whether the statements were made in the furtherance of Firestone's business and under the general direction of Firestone. *See, Halkias v. Wilkoff Co.* (1943), 141 Ohio St. 139, 152, 153, 47 N.E.2d 199.

house Electric Corp., 78 F.3d 1125, 1143 (6th Cir.1996). If a plaintiff "pleads conduct within in an individual's scope of employment and merely alleges bad or personal motive, summary dismissal of the scope challenge is warranted." *Id.* at 1143–1144. "The scope of employment issue does not focus on the alleged wrongful nature of the employee's actions; rather, the issue is the actions complained of and whether those actions are 'so divergent that [their] very character severs

the relationship of employer and employee.' " *Id.* at 1144, quoting *Osborne v. Lyles,* 63 Ohio St.3d 326, 330, 587 N.E.2d 825, 829 (1992).

4. In *Trader,* the plaintiff's co-workers allegedly defamed him by stating that he had threatened to shoot someone. *Trader,* 663 N.E.2d at 340. The appellate court found no evidence suggesting that these comments were made within the scope of employment. *Id.*

Perry has failed to set forth specific facts showing that Chandler's statements to her co-workers were made in furtherance of Firestone's business.

Second, the general rule in Ohio is that an employer is not liable for an employee's intentional, malicious torts performed outside the scope of employment. *Taylor v. Doctors Hospital* (1985), 21 Ohio App.3d 154, 156, 486 N.E.2d 1249. *Perry failed to set forth specific facts demonstrating how Chandler's statements to co-workers regarding sexual harassment by Perry fell within the scope of Chandler's employment as a secretary.* The trial court properly granted summary judgment to the appellees on this claim.

*Id.* at \*3 (Emphasis added). Similarly, in *Corradi v. Emmco Corp.*, No. 67407, 1996 WL 65822 (8th Dist. Feb. 15, 1996), the Eighth District Court of Appeals found that an employee acted outside the scope of her employment when she made allegedly defamatory remarks about a former co-worker. In 1991, plaintiff Rebecca Corradi was fired from her job as the property manager of an apartment complex. Following her termination, Irene Soltis, a former co-worker, informed visitors to the rental office that Corradi had been fired for taking money from petty cash. Soltis also informed a mutual friend that Corradi had been discharged for removing carpeting and appliances from the apartments. Finding these comments outside the scope of Soltis' employment, the Eighth District Court of Appeals reasoned:

> In this case, Soltis was employed by EMMCO and assumed some of the responsibilities of Corradi after Corradi was discharged. Her responsibilities did not include providing information regarding the reasons for Corradi's discharge from EMMCO and there is no evidence that her remarks tended to 'facilitate or promote' EMMCO's business.... Accordingly, Soltis was acting outside the scope of her employment,

and therefore, the trial court properly directed a verdict in favor of EMMCO. *Id.* at \*3.

In *Cooper*, 612 N.E.2d at 362–363, the Franklin County Court of Appeals reasoned that a church pastor acted outside the scope of his employment when he made disparaging remarks about a church member. In that case, the plaintiff, a member of the congregation, had contacted the Ohio Attorney General's office after unsuccessfully attempting to obtain copies of the church's by-laws and constitution. The Attorney General's office conducted an investigation and spoke with the church's pastor about providing the by-laws and constitution. *Id.* at 359–360. During a telephone conversation with the state investigator, the pastor remarked that the plaintiff should be prosecuted for misappropriating church funds. *Id.* at 360. The plaintiff subsequently filed suit against the church and its minister, alleging defamation. Upon review, the Tenth District Court of Appeals concluded that the pastor's derogatory comment fell outside the scope of his employment, reasoning:

> Certainly, it was within Calloway's scope of employment as a pastor to respond to the Attorney General's investigation relative to the production of the church's by-laws and constitution. On those matters, Calloway had authority to communicate with McClain. However, during the course of that conversation on those legal matters, it was not necessary for Calloway to inject his personal opinions as to plaintiff's alleged misconduct.
>
> At trial, plaintiff did not introduce any evidence that Calloway's gratuitous rendering of his personal evaluation of plaintiff's alleged prior conduct in any way facilitated the church's functions. During his case-in-chief, plaintiff failed to demonstrate that it was within Calloway's scope of employment, or duties as a minister, to publicly render personal opinions about members of the congre-

gation. No evidence was offered by the plaintiff that Calloway was authorized by the church to make such statements, nor was there evidence before the trial court that the church ratified Calloway's conduct after the fact. . . . The alleged defamatory remarks attributed to Calloway had nothing whatsoever to do with responding to McClain's official inquiry. . . .

*Id.* at 363.

■ In the instant case, Plaintiff argues that, like the above employees, Mathews' dissemination of the 16–page document to other members of his unit exceeded the scope of his employment. Gilbar focuses on the content of the document, stating that Mathews made a psychological diagnosis of him. Plaintiff asserts that Mathews' duties with the Air Force were administrative and, at no time during his service with the Air Force, was he authorized to provide psychological services or to diagnose any mental conditions. Gilbar, therefore, argues that Mathews' psychological diagnosis was not performed within the scope of his employment. Gilbar further argues that the distribution of the diagnosis to his co-workers served no reasonable purpose to the Air Force.

In response to Plaintiff's arguments, the United States asserts that Mathews acted within the scope of his employment, because he distributed a copy of his administrative complaint to certain select members of his unit so that they might evaluate it and submit their own complaints. The government further argues that Mathews had filed his grievance in a representative capacity. Thus, Mathews was merely working toward improving morale and resolving readiness problems with his unit, as was his duty as an officer.

In support of their arguments, both parties rely primarily upon the deposition testimony of Gregory Mathews. In his deposition, Mathews described his job duties. From 1989 until September, 1995, Mathews held the position of Director of Opera-

tions. (Mathews Depo. at 27) From September, 1995, until he transferred from the unit, he held the position of Air E Medical Operations Training Officer. (*Id.* at 30) Mathews described his job as Director of Operations, as follows:

As Director of Operations I was responsible for the entire functioning of the AEOT, as well as the interface that occurred between the air crews, the bases we were working on and so I was, I literally had, I had as the OIC, Officer In Charge, I had responsibility for all the personnel issues that occurred.

I was responsible if we were on a deployment and my folds needed some direction or counseling if they had some difficulties I was responsible for that. I had responsibility for, to make sure that the training occurred. I was responsible to make sure that, the bottom line of this is, I was responsible to make sure that the unit was war time ready and everyone was working in a cohesive fashion to make sure if the balloon went up and we got mobilized we would be ready to respond and meet the mission requirements. That's the bottom line. I was responsible to make sure that things worked.

(*Id.* at 31–32) As training officer, Mathews was "responsible for developing training to ensure that the operations team was qualified for their war time tasking." (*Id.* at 30)

Of principal interest for determining whether Mathews' distribution of his grievance was within the scope of his employment is his testimony regarding the capacity in which he filed his grievance and his rationale for doing so. The IG Complaint indicates Matthews' intention to file his grievance as a unit complaint. It states, in pertinent part, "[B]ecause of the serious negative impact Major Gilbar is having on the unit as a whole and the psychological distress he alone is creating, I am also submitting this complaint on behalf of several junior officers and enlisted personnel

who have asked that I 'do something' about Maj. Gilbar. Many unit members are hesitant to make complaints or come forward to challenge Maj. Gilbar's actions because of the potential retaliation he will direct at them. Unit members have turned to me for relief of their situations with Maj. Gilbar." (Mathews Depo. Ex. 3, p. 2) He reiterated this intention in his deposition: "I filed it as a unit complaint. Not as a complaint from me but as a unit complaint." Mathews further testified:

Q: ... So I am asking you did you feel that you had the authority of all these individuals to make that statement that you are filing this complaint on their behalf?

A: I had the authority as an officer of the United States Air Force to make my superiors know there were a number of individuals, including myself, a significant number of individuals in the unit that had very serious concerns about what was going on within that unit as related to Mr. Gilbar. And furthermore, that I had a duty to make sure that the IG or the command folks knew about that. I can't say that I went around and advertised that I am going to do, going to do a complaint, an IG complaint. Like I said, the morale and war time readiness status of the unit was not in good shape at that time. We were losing people. We were undermanned. Morale was not good and so I did not advertise this, the dirty laundry. I tried to keep the dirty laundry as quiet as possible.

Q: ... You're not saying today under oath that these people were a part of this Inspector General's complaint, that they wanted you to file it in their behalf, are you?

A: I am saying collectively people in the unit wanted me to do something about the situation that existed.

(Mathews Depo. at 94–95.) The above testimony, therefore, indicates that Mathews believed that he was acting in the best interest of the unit, and for the unit, in filing the complaint. He was then or just very recently had been responsible for the Unit's personnel and, as such, had a significant role to play in making certain that the Unit was war time ready and working cohesively.

When asked about the distribution of the grievance to members of his unit, Mathews testified that he so distributed the document so that those on whose behalf he had filed the grievance could elaborate on his grievance on their own, if they wished. Specifically, in response to being asked what he had hoped to gain by distributing the document to the unit members of which he was uncertain had requested a copy,[5] Matthews stated:

The letter that I received from Colonel Wilson, the IG letter said that if we want these other issues addressed that I brought forward in this complaint that the individuals would have to file their own separate complaints. The first thing that I wanted to do was provide those individuals that may want to file their own complaint with the information that I had given so that they could expand on that and develop their own complaints if they chose to do so.

(*Id.* at 103–104) Based on this testimony, the Court concludes that, unlike the Ohio cases noted above, the United States has presented evidence that Mathews' actions facilitated or promoted the interests of the United States Air Force, even though, by the time of the dissemination of the information, the IG, the JAG office and two commanding officers had advised him to

5. Mathews could not recall whether Sergeant Sites, Sergeant Star, or Command Sergeant Motz had asked or encouraged him to file a complaint with the Inspector General. (Mathews Depo. at 97–98) Of the numerous

personnel who received a copy of Inspector General's report, the only individual that Mathews could recall having asked for a copy was Colonel Stangle. (*Id.* at 98–100)

drop the complaint. There is, in short, no genuine issue of material fact in the record, sufficient to justify an evidentiary hearing, as to whether the alleged tortious conduct is "so similar to or incidental to the conduct authorized as to be within the scope of [the Defendant's] employment." Restatement (Second) of Agency # 229. There are no disputed *material* facts. The Court cannot say, for there is no genuine issue of material fact presented, that Mathews' actions, even if misguided or factually inaccurate or inappropriate, were "so divergent that [their] very character severs the relationship of employer and employee." Accordingly, the Court concludes, as a matter of law, that Mathews acted within the scope of his employment when he distributed his grievance to members of his unit. Because Mathews so acted, the substitution of the United States as Defendant was proper.

 A suit against the United States may only proceed if the government has waived its sovereign immunity. The sovereign immunity of the United States is generally waived with respect to tort actions pursuant to the waiver contained in the Federal Tort Claims Act (FTCA). *See* 28 U.S.C. § 2674; *see also United States v. Kubrick,* 444 U.S. 111, 100 S.Ct. 352, 62 L.Ed.2d 259 (1979). The general waiver, however, is subject to the exceptions contained in 28 U.S.C. § 2680. Section 2680(h) specifically excludes any claim arising out of libel and/or slander. 28 U.S.C. § 2680(h). The United States, therefore, has not waived its sovereign immunity for defamation claims. Accordingly, Plaintiff's claim against the United States for defamation must be dismissed.[6]

For the foregoing reasons, the Motion of Defendant United States to Dismiss (Doc. # 16) is Sustained. Judgment will enter in favor of the Defendant and against the Plaintiff, dismissing the captioned cause, with prejudice, for lack of this Court's subject matter jurisdiction.

The captioned cause is hereby ordered terminated upon the docket records of the United States District Court for the Southern District of Ohio, Western Division, at Dayton.

---

6. The Court's analysis, set forth above, renders unnecessary any consideration of the Defendant's arguments concerning the *Feres* doctrine, the doctrine of intra-military immunity included within or the duty status of Matthews (active as opposed to inactive) at the time of the events in question.